

Eileen W. Hollowell, Bankruptcy Judge
_____

1
2
3
4
5
6 UNITED STATES BANKRUPTCY COURT
7 FOR THE DISTRICT OF ARIZONA
8

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| JASON PAUL WISNIEWSKI and | ) | |
| CHRISTINE PATRICIA WISNIEWSKI, | ) | Case No. 2:12-bk-07266-EWH |
| | ) | |
| Debtors, | ) | |
| _____ | ) | |
| | ) | |
| SCOTT A. GOULD and KATHERINE | ) | |
| M. GOULD, | ) | Adv. No. 2:12-ap-01213-EWH |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | |
| JASON PAUL WISNIEWSKI and | ) | |
| CHRISTINE PATRICIA WISNIEWSKI, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I. **INTRODUCTION**

Scott Gould and Katherine Gould ("Plaintiffs" or "Goulds") seek to have a debt

against Jason ("Jay") Wisniewski and Christine Wisniewski (together "Debtors")

declared nondischargeable under Bankruptcy Code 11 U.S.C. §§ 523(a)(2) and (a)(6).

Plaintiffs' claim arose from their $250,000 loan made to permit Debtors to build out and

make other improvements to space they used to open a restaurant in Mesa, AZ. For the

reasons explained in the balance of this decision, which constitute the Court's findings

of fact and conclusions of law, Plaintiffs will be awarded a nondischargeable judgment in the principal amount of $100,000.

## II.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## III.  FACTS AND PROCEDURAL HISTORY

### A.  Prepetition Events

Plaintiffs and Debtors live in the same Phoenix neighborhood. Christine Wisniewski ("Christine") and Katherine Gould ("Katherine") socialized as members of a cinema club.

Among their assets, Debtors own a million-dollar home in Phoenix ("Phoenix Residence").[1] Christine owns a vacation home in her native Croatia overlooking the Adriatic Sea ("Croatian Residence"). (Exh. 10; Tr. (March 13, 2014) ("Tr. #1"), at 106:7-9; Tr. (April 7, 2014) ("Tr. #2"), at 106:21-25. Christine purchased the Croatian Residence in 2001 for approximately $35,000. (Tr. #1 at 62:2-10).

The Croatian Residence is surrounded by adjoining properties. Debtors' only access to the house is on a walking path. Debtors do not have an easement, but have verbal permission from their neighbors to use the path. (Id. at 81:8-19; 82:15-16.)  In addition, in 2010, when Christine attempted to list the Croatian Residence for sale, the Debtors learned that there was a dispute over its property lines. (Exh. G, at 17; Tr. #1 at 63:20-25–64:1-6; Tr. #2 at 136:1-3. At trial, Christine testified that resolution of the easement and the property line dispute required the Debtors to retain a lawyer in Croatia, and that litigation was likely. (Tr. #2 at 136.)

---

[1]  See Exhibit 10, Debtors' Amended Schedule A.

2

Debtors are college graduates and professionals: Jay has experience as an investment banker and Christine has a BFA degree and has worked on restaurant design. Debtors, through Caffe Boa, Inc. ("Caffe Boa"), own a restaurant which has successfully operated in Tempe, AZ. Prior to 2009, Debtors opened and operated two other restaurants in the Phoenix metropolitan area, both of which were successful and sold to third parties. (Tr. #2 at 112-113.)  In 2009, Debtors decided to open another restaurant in Mesa, AZ—Cafe Boa Bistro ("Bistro"). They needed money to proceed with the build-out. Christine asked Katherine if they could meet with her husband, Scott, a self-described "secured equity lender" to discuss obtaining a loan. (Tr. #1 at 93:22-23.)

In August, 2009, Debtors and Plaintiffs met and discussed a $250,000 loan ("Loan") from Plaintiffs to fund the improvements for Bistro. Scott testified that he was wary of restaurant investments. Nonetheless, he and Katherine, who would be using some of her own money to make the Loan, wanted to help Debtors because of Katherine and Christine's friendship. Katherine testified that she considered Christine to be a good friend, socially and professionally. (Id. at 32:21-22.)

On August 29, 2009, the two couples met again. Katherine claimed Debtors told her that Caffe Boa was "hugely successful" and could carry Bistro for several years. (Id. at 29:8-12.) Debtors also told Plaintiffs that they would grant Plaintiffs security interests in all of their assets, including the Phoenix Residence.

Plaintiffs testified that Debtors represented that there were two prior liens on the Phoenix Residence. Debtors deny making that representation. In fact, there was a third lien on the Phoenix Residence in favor of Alliance Bank as a result of a Small Business Administration loan made to help with the operation of Cafe Boa. Notwithstanding their

3

extensive experience in successfully operating and financing restaurants, Debtors

testified that they were completely unaware of the third lien until their bankruptcy

counsel discovered it shortly before the filing of Debtors' bankruptcy petition. (Tr. #2 at

48:5-20.)

Scott testified that he was nervous about the economy and concerned about the

equity in the Phoenix Residence, due to the falling real estate market. (Tr. #1 at 105:1-

8.) Debtors also offered to pledge the personal property at the restaurants, but Scott

testified that he "had no desire for any of the collateral on the restaurants." (Id. at

151:6-7.)

The only collateral that seemed valuable to Scott was the Croatian Residence.

While Debtors denied putting a value on the Croatian Residence during the Loan

negotiations, (see Tr. #2 at 26:14-16), the Court finds Scott's testimony credible that

Debtors told him it was worth $800,000 to $1,000,000 and was "free and clear."[2] (Tr. #1

at 106:2-5.) Scott's testimony is also bolstered by the fact that Debtors made a similar

representation about the value of the Croatian Residence to another creditor. See infra

p. 8. Debtors stated they would sell the Croatian Residence, if necessary, to repay the

Loan. (Tr. #1 at 30:19-22.) According to Scott: "Christine looked us right in the eye and

said don't worry, we will not default on the loan ...." (Id. at 113:16-18.) "[T]hat's what

turned me around from hating restaurants to saying I'm willing to make a loan," Scott

stated. (Id. at 106:19-21.)

Debtors never disclosed to Plaintiffs, however, that there was an easement issue

with the Croatian Residence. Debtors knew about the easement problem well before

---

[2] Jay testified that he did not know the meaning of the term "free and clear" until this trial. (Tr. #2 at 26:12-13.) Given Jay's business experience, that testimony is not credible.

Case 2:12-ap-01213-EWH    Doc 58    Filed 05/05/14    Entered 05/06/14 07:30:43    Desc
Main Document    Page 4 of 22

2009 because Christine testified that all of the furnishings for the Croatian Residence had to be carried up the path to the house with the oral permission of the neighbors. (Id. at 81-82). During the pendency of the Chapter 11 case, Debtors asserted that the easement issue, the property line issue, and a Croatian law provision which limited ownership of property[3], all negatively impacted the value of the Croatian Residence. During their 2009 discussions with the Plaintiffs, Debtors did not mention the easement issue or the ownership limitation of Croatian law. Ultimately, Debtors asserted that those two issues and the property line issue made it impossible for them to sell the Croatian Residence to satisfy their obligations to Plaintiffs. The Croatian Residence was eventually taken off the market, but it is still owned by Christine. (Id. at 65:1-5.)

A couple of days after the August 29, 2009 meeting, and before anything had been finalized or loan documents prepared, Jay pressed Plaintiffs for a $100,000 advance in order to meet contractor deposit demands. Plaintiffs agreed to make an initial $100,000 advance on September 2, 2009 ("First Advance"). Sixty thousand dollars was advanced by Scott, and Katherine advanced $40,000. On September 2, Debtors executed a "Promissory Note" dated September 2, 2009 ("Note") in the sum of $250,000 payable to Plaintiffs: 60% to Scott as his sole and separate property, and 40% payable to Katherine as her sole and separate property. Scott prepared the Note. Debtors also personally guaranteed the Note.

The Loan terms call for 18% per annum interest-only monthly payments commencing October 2, 2009, with a balloon payment on September 2, 2010. The default interest rate is 29.0% per annum. The Loan allows for separate advances. Scott

---

[3] According to Christine's testimony, prior to Croatia joining the European Union in 2013, only Croatian nationals could hold real property in their own name in Croatia. (Tr. #1 at 76:5-8; 80:20-25–81:1-4; Tr. #2 at 125:10-25–126:1-4.)

likened it to a construction loan with cash advances made according to construction progress. (Id. at 56:15-18.)

On September 22, a deed of trust on the Phoenix Residence, prepared by Scott, was recorded. Scott did not conduct a title search before preparing any of the Loan documents or recording the deed of trust.

The Note grants Plaintiffs a security interest in the Croatian Residence. Scott testified that he expected Christine to "help" with "making sure there was a recorded lien against" the Croatian Residence, while, on the other hand, Christine testified that Scott was handling all of the loan documentation, including doing whatever was necessary to have the Goulds' security interest perfected[4] under Croatian law. (Id. at 63:9-17; 106:11-15; 114:12-15; 114:24-25; 158:14-18.)

Scott testified that, because Debtors represented to him on a number of occasions that they would sell the Croatian Residence to pay the Note, he was not that concerned about perfecting the lien on the Croatian Residence as he would be in a normal business transaction. See, e.g., Id. at 117:20-25 – 118:1-5; 159:22-25–160:1. Scott testified that he did not follow his ordinary business practices as a lender, in part, based on the friendship relationship between Katherine and Christine. (Id. at 101:22-25; 110:16-19; 156:4-7; 159:12-17). Indeed, after the First Advance, the Goulds were among the few non-family members invited to attend Christine's 40th birthday party in Las Vegas, held in late September of 2009. (Tr. #2 at 100-101.)

On September 29, 2009, there was a second $100,000 advance ("Second Advance"). Prior to making the Second Advance, Scott was provided a copy of the

---

[4] While the party witnesses did not use the term "perfected," they were generally familiar with security interests and understood that certain legalities were required to preserve the lien. Therefore, the term reflects the substance of the parties' negotiations.

6

contractor's spreadsheet/budget, which convinced him that Debtors were "still in the money," i.e. within the $250,000 budget for improvements on Bistro.[5] (Tr. #1 at 121:1.) However, Scott also testified that he became "concerned," at the time of the Second Advance, when Jay told him Debtors were "fully maxed out on their credit" and asked that the check be made out to him personally. Scott declined. (Id. at 134:7-13.)[6] A final $50,000 advance was made on November 4, 2009 ("Third Advance"). (Id. at 157-158). Debtors commenced interest payments in October of 2009. (Tr. #2 at 65:1.)

Bistro opened in January of 2010, but was unsuccessful and closed 18 months later, in July of 2011. (Tr. #1 at 44; 70.) The Loan went into default at its maturity date in September of 2010. At that time, the parties had more discussions, leading to oral extensions of the Loan repayment. During those 2010 meetings, Debtors again assured Plaintiffs that they would sell the Croatian Residence to pay off the Loan, and stated that the house was listed for sale. (Id. at 63:18-25–64:1-9; 74:3-4.)

Unbeknownst to Plaintiffs (Tr. #2 at 91:21-23), at the time the Loan matured, Debtors entered into new loan transaction with a "hard money" lender, Ira Gaines, and/or his corporation, IG Holdings, Inc. ("IG") (Id. at 91:17-24.) Debtors testified that they needed more money for Bistro in order to fund the total budget for improvements, which was closer to $500,000. (Id. at 7:1-7.) On September 1, 2010, Debtors executed a "Security Promissory Note" for $75,000[7] ("IG Note"). The IG Note was secured by the

---

[5] Katherine is the 50 percent owner of an interior design company, Golden Fortune, which was paid $35,000 for design work on the Bistro project. Katherine testified that her company earned approximately $6,000 on the work with the balance of the money going to contractors who performed the work. (Tr. #1 at 53:9-23.)

[6] The Court finds Scott's testimony credible, despite Jay's denial that he ever discussed personal financial issues with Scott. (Tr. #2 at 44:19-25.)

[7] An additional $10,000 was borrowed in January 2011.

7

same collateral pledged to Plaintiffs, including the Croatian Residence, which Debtors represented was "free and clear" and worth $1,178,000. (Exh. 18.) In addition, Debtors pledged the personal property located at both restaurant and wine inventory, including wine owned by Christine valued at $50,000. (Tr. #2 at 121:7-10.)

Christine testified that she did not read any of the documents prepared by IG, including the security agreement which itemized the collateral being pledged to secure the IG Note. (Id. at 32:1-5; 120:10-12.) She further testified that she did not store any wine at the Phoenix Residence and that all wine was owned by Cafe Boa or a wholly owned "start up" LLC, which was formed to market wine. (Id. at 138:14-25–139:1-9.) The monthly payments on the IG Note were the same as the payments to the Goulds, i.e., $3,750.

Debtors continued to make some interest payments on the Loan at the non-default rate until May of 2011, for a total of approximately $75,000. (Id. at 65:9-12.) Debtors did not inform Plaintiffs of Bistro's July closing until September 2011.[8] By then, the Goulds were divorced, but were still jointly communicating with Debtors to resolve the Loan's default.

By September 2011, Debtors had repaid all but $10,000 of the IG Note. (Exh. 18, exh. F.) Christine testified that they paid the IG Note rather than the Loan due to its higher interest rate, while Jay claimed they paid it because Ira Gaines was a "scary man." (Tr. #2 at 37:4; 131:1-2.) On September 29, 2011, IG filed a complaint against Debtors in state court seeking a judgment for the balance due on the IG Note and immediate transfer of collateral. (Id.)

---

[8] Katherine testified she learned about Bistro's closing from a third party and contacted Christine to confirm that Bistro had closed. (Tr. #1 at 35:13-25.)

8

Debtors and Plaintiffs met again in November of 2011. The Croatian Residence had been listed for sale since September of 2011. (Tr. #1 at 74:3-5.) Debtors still did not tell Plaintiffs about the easement problems. (Id. at 74:6-9.) Debtors also did not tell Plaintiffs about the IG Note, the $75,000 repayment of that Note, the IG security interest in the Croatian Residence[9] or the pending lawsuit with IG, whose allegations Debtors denied. (Tr. #2 at 32:19-22; 57:12-19; 91:17-24.) At the November 2011 meeting, Plaintiffs orally agreed to extend the due date on the Loan until January 2014. (Tr. #1 at 76:10-22; Exh. 11.) Thereafter, no further payments were received by Plaintiffs on the Loan, and Debtors ceased communicating with either of Plaintiffs.

**B. Events in Chapter 11**

Debtors filed a voluntary chapter 11 petition on April 6, 2012. No wine was listed on Exhibit B of their Schedules. On Schedule A, Debtors listed the Croatian Residence as being worth $250,000 and encumbered by Plaintiffs' $250,000 claim. Schedule A was then amended three more times. On May 8, 2012, in an effort to support Debtors' application for abandonment filed on the same date, they amended Schedule A to list the Croatian Residence value at $0. They claimed the reason for the abandonment was that the property could not be insured. (Tr. #2 at 82-83; 124-125.)

However, the Notice of Abandonment of the Croatian Residence did not mention any insurance issue. It stated:

> [T]he property is burdensome on the estate, has no consequential value to the estate and is of no benefit to the estate. In Croatia, ownership of property is limited to Croatian nationals only which prevents the property from being sold to just any interested buyer. In addition,

---

[9] Christine testified, on the first day of trial, that, as of September 2011, Debtors had *not* offered any other lenders a security interest in the Croatian Residence. (Tr. #1 at 74:14-16.) This testimony was proven false by Exhibit 18—IG security agreement, which was introduced and admitted on the second day of trial. Christine's false testimony about pledging the Croatian Residence to IG calls into question the veracity of all her testimony.

there is a dispute over the property lines that clouds the title and would prevent an immediate sale. Based on the above, the Debtors place their value in the property as being zero. The Debtors may continue to remain as the owners of the property.

Exhibit 9.

Both Katherine and IG objected to the abandonment challenging Debtors' assertions that the Croatian Residence was of no value to the estate. The motion to abandon was denied on June 6, 2012. (Minute Entry, ECF No. 37, 2:12-bk-07266-EWH.)

On May 24, 2012, Debtors filed their second amended Schedule A to change Plaintiffs' secured claim against the Croatian Residence from $250,000 to $0. Finally, on September 6, 2012, Debtors filed the last amended Schedule A in order to change the value of the Croatian Residence to $28,000. Christine explained the increase in value came after their realtor suggested they try to do a "quick sale." (Tr. #1 at 84:103.)

On June 29, 2012, Plaintiffs filed a proof of secured claim in the amount of $250,000, plus interest, costs and attorneys' fees. On September 5, 2012, Debtors obtained a default judgment avoiding the Plaintiffs' lien against the Phoenix Residence. (ECF No. 12, Adv. No. 2:12-ap-00957-EWH.) On August 31, 2012, Debtors filed their Chapter 11 Plan ("Plan"). The Goulds did not object to the Plan, which was confirmed on November 16, 2012. The Plan treats the Goulds' Class 2C secured claim as wholly unsecured. Section X of the Plan, entitled "Chapter 7 Liquidation Analysis," explains that the Croatian Residence was worth no more than $28,000 for its land value only and, due to the easement and property line issues, "would be impossible to sell at this time." (Exh. G at 16-18.) The Plan does not pay the $28,000 value of the Croatian Residence

to unsecured creditors. Because the Plan provides that, at confirmation, all property vests in the Debtors, the Croatian Residence is currently owned by Christine.

Under the Plan, the $10,000 remaining principal balance on the IG Note was reduced to a secured claim of $6,250, and an unsecured claim of $3,750, by agreement of the parties. See Exh. H, ¶ 12. Unsecured claims totaling $732,193.16 (including the $250,000 Gould claim) receive a total distribution of $11,606, pro rata, over 60 months, which represents approximately a 1% distribution. (Exh. H, exh. A-1.) The Goulds' pro rata share of the distribution to unsecured creditors is just under $4,000. The Debtors have issued a check to Plaintiffs for the full amount due them under the Plan, which Plaintiffs have not cashed.

Plaintiffs filed this nondischargeability complaint ("Complaint") on June 28, 2012. The Complaint alleges, inter alia, that Debtors fraudulently represented, and Plaintiffs relied on the representation, that the "free and clear" Croatian Residence would be used for their benefit and that Debtors would take the necessary steps to give Plaintiffs an enforceable security interest in the Croatian Residence. The Goulds also alleged that Debtors falsely represented that none of the loan proceeds would be used for Debtors' personal expenses. Plaintiffs sought a judgment of nondischargeability for $250,000 plus interest, costs and attorneys' fees pursuant to the terms of the Note.

## IV.  **ISSUES**

1.     Whether the Loan is nondischargeable under § 523(a)(2)(A) because it arose from false pretenses, fraudulent representation or actual fraud.

2.     Whether the Loan is nondischargeable as a willful and malicious injury pursuant to § 523(a)(6).

# V. **DISCUSSION**

## A. **Section 523(a)(2)(A)**

Section 523(a)(2)(A) provides that, "A discharge under ... this title does not discharge an individual debtor from any debt (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

To except a debt from discharge under § 523(a)(2)(A), a creditor must demonstrate five elements: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009), aff'd, 407 Fed. Appx. 176 (9th Cir. 2010) (quoting Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)).

The creditor bears the burden of proving all five elements by a preponderance of the evidence. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010). In order to strike a balance between allowing debtors a fresh start and preventing a debtor from retaining the benefits of property obtained by fraudulent means, exceptions to discharge under § 523(a)(2)(A) are construed strictly against creditors and in favor of debtors. Id.

12

## 1. **First Advance**

### (a) **Fraudulent Representations or Omissions**

The first three elements of § 523(a)(2)(A) require proof that Debtors made representations that at the time they knew were false, and that they made such representations with the intention and purpose of deceiving Plaintiffs. Defendants argue that Plaintiffs did not establish a false representation by Debtors or that Debtors intended to defraud Plaintiffs at the time the Loan was made.

At the time of the First Advance in 2009, Debtors promised that they would repay the Loan and would not default. They made the required interest-only payments for the initial term of the Loan and sporadically thereafter. Plaintiffs received approximately $75,000 in interest payments. Therefore, the evidence does not demonstrate that Debtors entered into the Loan with no intention to repay it. The evidence indicates that Debtors used the First Advance for the build-out of Bistro, which is consistent with the representations they made to Plaintiffs. Debtors also represented that Caffe Boa could carry the new restaurant. While, in hindsight, that turned out to be untrue, the evidence showed that the improvements for Bistro were completed and that Bistro opened and operated for 18 months. While Plaintiffs did not establish fraudulent intent with regards to Debtors' promise of repayment, the inquiry about whether Debtors made false representations at the time the Loan was made does not end there.

Debtors made false representations and omissions of material facts with regards to the Croatian Residence. In the Ninth Circuit, oral representations about sources of income that could be looked to for repayment are actionable under § 523(a)(2)(A). <u>See</u> <u>Barnes v. Belice (In re Belice)</u>, 461 B.R. 564, 577-78 (9th Cir. BAP 2011). Here, Debtors (1) misrepresented the Croatian Residence value; (2) failed to

disclose the easement problems; (3) misrepresented that they would help the Goulds perfect a lien on the Croatian Residence; and (4) failed to disclose that the Croatian Residence could only be sold to a Croatian national if it had to be sold to satisfy the Loan.[10]

A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the omission was motivated by an intent to deceive. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n.4 (9th Cir. 2001) (citing Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1089-90 (9th Cir.1996)). To determine whether such a duty exists in a business transaction, the Ninth Circuit looks to the Restatement (Second) of Torts. Section 551 of that treatise provides, in pertinent part, that a party must disclose "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading" and "facts basic to the transaction. See Apte v. Japra (In re Apte), 96 F.3d 1319, 1324 (9th Cir.1996); Belice, 461 B.R. at 580. A statement is misleading "when it purports to tell the whole truth and does not." Restatement (Second) of Torts, § 551, cmt. g.

Debtors owed a duty to the Goulds to disclose any condition or other factor which would reduce the value of the Croatian Residence or impede Debtors' ability to sell it to satisfy the Loan. The evidence demonstrates that they failed to do so.

The next question is whether the affirmative misrepresentations and omissions were fraudulent, i.e., done with knowing falsity and intent to deceive. "To

---

[10] It is unclear from Christine's testimony whether, before Croatia joined the EU, property could be sold to a trust or holding company. Even assuming that such entities could own property, that would still be a limitation on marketability and Plaintiffs were relying on the promise that Debtors would sell the house to pay them. Therefore, not disclosing any limitation on Debtors' ability to sell the Croatian Residence was a material omission.

establish knowing falsity, Plaintiffs must establish [Debtors] either knew that the representation was false or recklessly disregarded the truth when [they] made the representation." Burks v. Bailey (In re Bailey), 499 B.R. 873, 888 (Bankr. D. Idaho 2013) (alteration added). "[I]ntent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch), 237 B.R.160, 167-68 (9th Cir. BAP 1999) (cited with approval in Cai v. Shenzhen Smart-In Indus. Co., Ltd. (In re Cai), 2012 WL 1588834, at *5 (9th Cir. BAP May 7, 2012), aff'd, ___ Fed. Appx. ___, 2014 WL 1647730 (9th Cir. 2014); see also Locke v. United States Trustee (In re Locke), 205 B.R. 592, 597 (9th Cir. BAP 1996) ("Intent may be inferred from the circumstances.").

Debtors' representations that the Croatian Residence would fully secure the Loan and/or its sale proceeds would repay the Loan in full were either knowingly or recklessly false statements, based on their false representation that the value of the house, purchased for $35,000, was worth $800,000 to $1,000,000. The Court does not find credible Debtors' testimony denying that they could not recall giving any estimate of value to Plaintiffs and specifically denying that they gave a value of $800,000 to $1,000,000. Debtors represented a similar value for the Croatian Residence -- $1,178,000--when they executed the IG Note. Debtors deny that they provided values in the IG loan documents and testified that they challenged those allegations in state court. (Tr. #2 at 31:21-25–32:1-5; 123.) However, in Arizona, the general rule is that "one who signs a written document is bound to know and assent to its provisions in the absence of fraud, misrepresentation, or other wrongful acts by the other party." Teran v. Citicorp Person-to-Person Fin. Center, 146 Ariz. 370, 372, 706 P.2d 382, 384 (Ct. App. 1985).

The evidence demonstrates that Debtors were extremely eager to obtain the Loan, that they wanted an immediate advance of $100,000 and, in an effort to obtain the Loan, recklessly or intentionally represented to Plaintiffs that they had sufficient assets to assure repayment. Debtors knew or should have known that representing the value of the Croatian Residence at $800,000 was a significant factor in Plaintiffs' willingness to make the Loan. Debtors provided no credible evidence to support an increase in value to the Croatian Residence from its $35,000 purchase price to $800,000.

Furthermore, Debtors' testimony that they never agreed to help Plaintiffs to perfect Plaintiffs' lien on the Croatian Residence is not credible. The Goulds' testimony that Christine agreed to help was more credible than her testimony that Scott would undertake that task given the fact that Christine was a Croatian national and would presumably know something about property law because she purchased the Croatian Residence. Debtors' subsequent representation to IG that the Croatian Residence was "free and clear" suggests that, from the very beginning of the parties' discussions, Debtors did not intend for Plaintiffs to obtain a perfected lien on the Croatian Residence.

Accordingly, Debtors made material misrepresentations to Plaintiffs regarding the value of the Croatian Residence and Plaintiffs' secured interest in it. Those representations represent, at the very least, a reckless disregard for the truth and establish Debtors' fraudulent intent at the time the Loan was negotiated.

**(b)  Justifiable Reliance and Damages**

The fourth and fifth elements of § 523(a)(2)(A) require "justifiable reliance" by Plaintiffs on the fraudulent representation or omission and damages proximately

caused by such reliance. <u>Slyman,</u> 234 F.3d at 1085. The justifiable reliance standard is subjective and turns on a person's knowledge under the particular circumstances. <u>Eashai</u>, 87 F.3d at 1090; <u>Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)</u>, 973 F.2d 1454, 1458 (9th Cir. 1992). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." <u>Field v. Mans</u>, 516 U.S. 59, 70 (1995) (quoting <u>Restatement (Second) of Torts</u> § 545A cmt.b (1976)). A bankruptcy court must consider "the knowledge and relationship of the parties themselves." <u>Tallant v. Kaufman (In re Tallant)</u>, 218 B.R. 58, 67 (9th Cir. BAP 1998) (citation omitted.)

The justifiable reliance standard generally does not entail a duty to investigate. <u>See</u> <u>Field</u>, 516 U.S. at 70. However, a duty to investigate is imposed on a creditor if there are suspicious circumstances or "red flags." <u>Id.</u> at 71; <u>Mandalay Resort Grp. v. Miller (In re Miller)</u>, 310 B.R. 185, 198 (Bankr. C.D. Cal. 2004) (citing <u>Anastas v. Am. Savings Bank (In re Anastas)</u>, 94 F.3d 1280,1286 (9th Cir. 1996)).

In cases involving fraudulent omissions, "justifiable reliance is established when a party with a duty to disclose a material fact fails to do so," because justifiable reliance can then be inferred. <u>Tallant,</u> 218 B.R. at 68 (citing <u>Apte</u>, 96 F.3d at 1323). Here, there were both fraudulent representations and omissions.

Debtors maintain that Scott could not have justifiably relied on their representations or omissions because he was an experienced secured lender who volunteered to prepare the Loan documents. Debtors, however, pressed the Goulds with their urgent Loan request in September 2009, using their bond of friendship to obtain the First Advance. Scott had just enough time to draw up the Note, inserting a

17

cross-collateralization provision for the Croatian Residence. The suggestion that Plaintiffs could have investigated the value of the Croatian Residence (and how to perfect their interest in it) before advancing $100,000 on the same day the Loan was made, is meritless. The evidence demonstrates that Scott justifiably relied on Debtors' representations concerning the collateral, and Katherine deferred to Scott's business judgment.

Plaintiffs must further prove that they sustained loss as the proximate result of Debtors' representations or omissions. "[P]roximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a substantial factor in determining the course of conduct that results in loss [to Plaintiffs] ... and (2) legal causation, which requires [Plaintiffs''] loss to reasonably be expected to result from reliance." Providian Bancorp v. Bixel (In re Bixel), 215 B.R. 772, 777 (Bankr. S.D. Cal.1997) (internal quotation marks omitted).

Considering all of the evidence, the Court finds that the Goulds' reliance on Debtors' false representations or omissions was the proximate cause of their damages for the First Advance.

### 2. Second and Third Advances

No additional false representations or omissions were made between the First Advance and the Second and Third Advances. But, the original fraudulent misrepresentations and omissions carried over to the subsequent Advances.

Debtors contend that justifiable reliance was absent, however, because, at the time of the Second Advance, Scott had had a month in which to conduct a title search for the Phoenix Residence or conduct research on how to perfect a lien on the Croatian Residence. While one month is not much time to research how to perfect a lien under

18

Croatian law, had Scott conducted a title search on the Phoenix Residence he would have been aware of possible problems with the collateral for the Loan. Furthermore, prior to the Second Advance, Jay told Scott the Debtors were maxed out on their credit. Coupled with Jay's request that the Second Advance be paid to him personally, there were clearly "red flags" blowing at the time of the Second Advance. Therefore, Plaintiffs' continued reliance on Debtors' misrepresentations was not justified as to the Second and Third Advances. Accordingly, the $150,000 of those two Advances is dischargeable.

**B.  Section 523(a)(6)**

Plaintiffs assert a claim of "willful and malicious injury" to themselves or their property under § 523(a)(6). The claim is twofold: first, it is based on an alleged breach of contract that is accompanied by tortious conduct. Second, Plaintiffs argue that Debtors engaged in a pattern of misconduct with the intent to harm them. (Plaintiffs' Pretrial Mem., ECF No. 51 at 3-4; Tr. #2 at 152–157, Closing Argument.)

For a debt connected to a breach of contract to be excepted from discharge under § 523(a)(6), the breach "must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.'" Lockerby v. Sierra, 535 F.3d 1038, 1041 (9th Cir. 2008). In addition, conduct is tortious only if it constitutes a tort under state law. Id.

Plaintiffs, in their pretrial brief, give the example of an employer willfully choosing not to pay an employee's wages. See Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001). The tort in Jercich arose from public policy and California law that recognized a special duty to pay wages. "Wages are not ordinary debts," the Ninth

19

Circuit held. Id. at 1207. Here, Plaintiffs have not identified any violation of state law or public policy in relation to the Loan.

Plaintiffs failed to prove that Debtors engaged in a pattern of fraudulent misconduct that was intended to harm them and/or their security interest. Damages resulting from a fraudulent scheme or a pattern of intentional conduct that necessarily results in an injury may be nondischargeable under § 523(a)(6). See, e.g., Murray v. Bammer (In re Bammer), 131 F.3d 788, 791 (9th Cir. 1997), (scheme to conceal equity in home from injured victims, pre Kawaauhau v. Geiger, 523 U.S. 57 (1998)); Johnson v. JP Morgan Chase Bank, 395 B.R. 442, 448 (E.D. Cal. 2008) (refusing to dismiss complaint that alleged a fraudulent scheme to injure); Kim v. Michel (In re Kim), 2006 WL 6810943, at *3 (9th Cir. BAP March 17, 2006) (affirming bankruptcy court's nondischargeability judgment based on pattern of intentional concealment of property issues); see generally 4 COLLIER ON BANKRUPTCY ¶ 523.12[1] (16th ed. 2014) (by its terms, § 523(a)(6) applies to "broad range of conduct").

Plaintiffs assert that Debtors' pattern of misconduct began when Debtors, in desperate financial straits, intentionally misrepresented and concealed information in order to procure the Loan. Immediately after obtaining the Loan, Plaintiffs contend that a pattern of injurious behavior emerged. Plaintiffs claim that Loan proceeds were used for Christine's 40th birthday party and to otherwise support the couple's allegedly extravagant lifestyle. Plaintiffs further claim that when Debtors needed additional cash, they borrowed $85,000 from IG, pledging the same collateral that they told Plaintiffs was

theirs. Then, Debtors did not use the proceeds from the IG Note to pay off the Loan, but instead repaid IG $75,000 and leased new cars.[11]

To establish a willful and malicious injury, however, there must be a clear link between the debt and the injury. Here, Plaintiffs have failed to trace the Loan proceeds to Debtors' personal use, particularly in view of the facts that Bistro, for which the Loan was made, opened and operated for 18 months and that Scott testified that he was satisfied with the contractor's budget vis-à-vis the Loan amount. Debtors' transactions with IG do not appear to be part of a scheme to injure Plaintiffs but rather a last-ditch attempt to keep Bistro operating.

Plaintiff's evidence fails to establish Debtors' specific intent to harm, and malice towards, Plaintiffs. See Carrillo v. Su (In re Su), 290 F.3d 1140, 1142-44 (9th Cir. 2002). Even if it is assumed Debtors' conduct in the bankruptcy case, including their attempted abandonment of the Croatian Residence, was directly harmful to Plaintiffs, that conduct occurred long after the debt arose. Therefore, Plaintiffs have failed to establish nondischargeability of the Loan debt under § 523(a)(6).

### VI. CONCLUSION

Plaintiffs have satisfied the requirements of § 523((a)(2)(A) with respect to the First Advance in the principal amount of $100,000, plus interest, costs and fees calculated pursuant to the Note up to the petition date. Counsel for Plaintiffs is directed to upload a form of judgment consistent with this ruling. Judgment interest to accrue at the federal rate.

Dated and signed above.

---

[11] Debtors testified that two of the cars were leased to be used by employees of the restaurants, who made the car payments.

21

1

Notice to be sent through the Bankruptcy Noticing
2   Center "BNC" to the following:

3
Allan D. NewDelman
4   ALLAN D. NEWDELMAN, P.C.
80 E. Columbus Ave.
5   Phoenix, AZ 85012-0144

6
Teresa H. Foster
7   TERESA H. FOSTER, PLLC
2400 E. Arizona Biltmore Circle, Ste. 1300
8   Phoenix, AZ  85016

9
Office of the U.S. Trustee
10  230 North First Ave., Suite 204
Phoenix, AZ 85003
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28